

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-25-2008

# Siahaan v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-3819

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Siahaan v. Atty Gen USA" (2008). *2008 Decisions.* Paper 1392.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1392

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 06-3819

JULIETTA SIAHAAN;
JOHNSON MARLULAN;
ALICIA LUBIS;
AGATHA LUBIS,

Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES

Petition for Review of an Order
of the Board of Immigration Appeals
(Agency File Nos. A96-264-077, 78, 79, 80)

Submitted pursuant to Third Circuit LAR 34.1(a)
February 4, 2008

Before: McKEE and AMBRO, Circuit Judges,
and IRENAS, District Judge[*]

(Opinion filed: March 25, 2008)

OPINION

McKEE, Circuit Judge.

Julietta Siahaan, Johnson Marlulan, Alicia Lubis and Agatha Lubis petition for

_____

[*]The Honorable Joseph E. Irenas, Senior District Judge of the United States
District Court for the District of New Jersey, sitting by designation.

1

review of an order of the Board of Immigration Appeals affirming the decision of the Immigration Judge denying their application for Siahaan for asylum, withholding of removal and relief under the Convention Against Torture ("CAT"), as well as Julietta Siahaan's derivative asylum applications on behalf of Johnson Marlulan and Alicia and Agatha Lubis. For the reasons that follow, we will deny the petition for review.[1]

## I.

Because we write primarily for the parties, we need not recite the factual or procedural background of this case except insofar as is necessary to our discussion.

Siahaan claimed she is eligible for relief because she is a member of the Batak ethnic group and because she is a Christian. At her hearing before the IJ she introduced approximately seventy-nine articles and reports[2] in support of her claim. The IJ found Siahaan was not credible. He also found that the evidence did not establish country-wide persecution of Batak Christians. While Siahaan's background materials and various country reports show significant violence between Christians and Muslims in Sulawesia and the Moluccas, they do not show violence in Jakarta (where she is from). The IJ

---

[1] Although there are multiple requests for relief, inasmuch as they are all derivative of Julietta Siahann's claim, we will refer only to Julietta's claim. *See* 8 *U.S.C. § 1158(B)(3)* (spouse and children may be "granted the same status as the alien. . . ").

[2] The parties stipulated to the IJ taking administrative notice of the U.S. Department of State's 2003 Country Reports on Human Rights Practices for Indonesia, the State Department's 2004 International Religious Freedom Report for Indonesia, and the Annual Report of the United States Commission on International Religious Freedom dated May 2004.

concluded that the only religious conflict in Jakarta concerned the establishment of churches without municipal permits and that there is no evidence that such requirements are not applicable to places of worship. He also found that Siahaan did not produce any evidence that Bataks were targeted for violence along with ethnic Chinese during the May 1998 civil riots, or that ethnic Bataks are targeted for violence based on their ethnicity. Finally, the IJ found that Siahaan did not present sufficient evidence to establish that she will more likely than not be tortured upon her return to Indonesia or that the government would be complicit even if such torture were to occur. In lieu of removal, the IJ granted the petitioners' requests for voluntary departure.

On appeal to the BIA, Siahaan argued, for the first time, that there was a pattern or practice of persecution against Batak Christians in Indonesia. In an opinion dated July 21, 2006, the BIA reversed the IJ's finding that Siahaan was not credible, but it agreed with the IJ's finding that Siahaan failed to meet her burden of proving that she was eligible for asylum, withholding and relief under the CAT.

The BIA held that there was not a pattern or practice of persecution of Batak Christians by the government of Indonesia or forces the government was unable or unwilling to control. It explained, "It is clear that ethnic and religious tensions and violence do exist, and in particular, [Siahaan's] documentary evidence confirms this, as do the Country Reports from government agencies," but the Country Reports also indicate that in general inter-religious tolerance and cooperation improved in 2004. . . ."

App. 10. The BIA also concluded that while "[t]he reports on religious freedom express concern over continuing religious tension and violence," they do not establish that the government of Indonesia or forces the government was unable or unwilling to control engaged in a pattern or practice of persecution of Christians or Bataks. *Id.* The BIA affirmed the IJ's grant of voluntary departure. This petition for review followed.

## II.

Where, as here, the BIA issued a decision on the merits rather than merely summarily affirm the IJ, we review the BIA's decision, not the IJ's. *Gao v. Ashcroft,* 299 F.3d 266, 271 (3d Cir.2002); *Abdulai v. Ashcroft,* 239 F.3d 542, 548-49 (3d Cir.2001). We must uphold the BIA's factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias,* 502 U.S. 478, 480 (1992). We should find substantial evidence lacking only where the evidence "was so compelling that no reasonable factfinder could fail to find the alien eligible for asylum or withholding of removal." *Id.* at 483-84; *see also* 8 U.S.C. § 1252(b)(4)(B); *Abdille v. Ashcroft,* 242 F.3d 477, 483-84 (3d Cir.2001).

## III.

The Attorney General has discretion to grant asylum to a removable alien. *See* 8 U.S.C. § 1158(a). However, that discretion can only be exercised if the alien first establishes that he/she is a "refugee." *Id.* A "refugee" is:

> any person who is outside any country of such person's
> nationality or, in the case of a person having no nationality, is

outside of any country in which such person last habitually resided, and who is unable or unwilling to avail himself or herself of the protection of that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The asylum applicant must present some evidence that removal will result in persecution "on account of" one of the five statutory grounds in order to establish eligibility for asylum.

An applicant who offers credible testimony regarding past persecution is presumed to have a well-founded fear of future persecution. *Berishaj v. Ashcroft,* 378 F.3d 314, 323 (3d Cir.2004) (citation omitted). The "well-found fear of persecution" standard involves both a subjectively genuine fear of persecution and an objectively reasonable possibility of persecution. *INS v. Cardoza-Fonseca,* 480 U.S. 421, 430-31 (1987). The subjective prong requires a showing that the fear is genuine. *Mitev v. INS,* 67 F.3d 1325, 1331 (7th Cir.1995). The objectively reasonable prong requires ascertaining whether a reasonable person in the alien's circumstances would fear persecution if returned to a given country. *Zubeda v. Ashcroft,* 333 F.3d 463, 469 (3d Cir.2003) (citation omitted). "To satisfy the objective prong, the asylum petitioner must show he or she would be individually singled out for persecution or that 'there is a pattern or practice in his or her country . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political

5

opinion.'" *Sukwanputra v. Gonzales,* 434 F.3d 627, 637 (3d Cir.2006) (quoting 8 C.F.R. § 208.13(b)(2)(iii)(A)). Although "pattern or practice," is not defined, we have explained that "the persecution of the group must be systematic, pervasive, or organized" to constitute a pattern or practice. *Id.* (citation omitted). "In addition, as with any claim of persecution, the acts must be committed by the government or forces the government is either unable or unwilling to control." *Id.* (citation omitted).

Withholding of removal is mandatory once "the Attorney General determines that [the] alien's life or freedom would be threatened" because of a protected trait or activity.[3] 8 U.S.C. § 1231(b)(3)(A). An alien must establish a "clear probability," i.e., that it is more likely than not, that he/she would suffer persecution. *See INS v. Stevic,* 467 U.S. 407, 429-30 (1984). Because this standard is higher than that governing eligibility for asylum, an alien who fails to qualify for asylum is necessarily ineligible for withholding of removal. *Zubeda,* 333 F.3d at 469-70.

## IV.

Siahaan argues that the BIA's ruling is not supported by substantial evidence. We disagree. [4,5] We disagree.

---

[3]An application for asylum is deemed at the same time to be an application for withholding of removal. 8 C.F.R. § 1208.3(b).

[4]Siahaan also argues that the IJ did not consider all of the record evidence in determining whether there was a pattern or practice of persecution against Bataks and Christians. However, as noted, because the BIA issued a decision on the merits and did

(continued...)

6

The record contains no probative evidence of the persecution of Bataks in Indonesia. Indeed, Siahaan's counsel admitted that her claims were based primarily on her religion rather than her ethnicity. The only evidence she introduced concerning possible persecution of Bataks is a 1990 article discussing the Indonesian government's cancellation of the Congress of Batak Protestant Churches. The article noted that the primary reason the government cancelled the Congress was because church leaders had intervened on behalf of villagers affected by a pulp factory. A.R. 356.

Her claim of a pattern or practice of persecution of Christians in Indonesia fares no better. In *Lie v. Ashcroft*, 396 F.3d 530 (3d Cir. 2005), in denying Chinese Christian petitioners' applications for asylum and withholding, we wrote:

> Petitioners argue, with some force, that anti-Chinese violence persists, . . . Nevertheless, such violence does not appear to be sufficiently widespread as to constitute a pattern or practice. . . . Moreover, this violence seems to have been primarily wrought by fellow citizens and not the result of governmental action or acquiescence.

*Id*. at 537-538. Siahaan is not a Chinese Christian, and the documentary evidence here, as

---

[4](...continued)
not simply affirm the IJ, we review the BIA's decision, not the IJ's.

[5]Siahaan claims, without any legal or factual argument, that the IJ erred in denying her claim for relief under the CAT. However, as noted above, we are reviewing the BIA's decision. Moreover, she makes her CAT claim in a perfunctory manner. Accordingly, she has waived this issue. *See Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) ("[c]asual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal."). We add, however, that the record here does not support a CAT claim in any event.

7

in *Lie*, states that inter-religious tolerance and cooperation improved in 2004. The International Religious Freedom for Indonesia in 2004 stated that "notable advances in interreligious tolerance and cooperation occurred during the period covered by this report." The Annual Report of the U.S. Commission on International Religious Freedom noted that although the government has been unable to halt all religiously-related violence, the situation has improved since 2001.

Siahaan claims that the government is complicit in violence against Christians. However, the BIA's finding to the contrary is supported by substantial evidence. The Religious Freedom Report states that the government "cracked down on terrorists and other extremists who carried out attacks in the name of religion. . . ."[6] The Report also noted that the government prosecuted a number of others implicated in the Christmas Eve church-bombings. In fact, The Human Rights Watch Report that Siahaan provided stated the government's crackdown on religious violence has caused some Muslims to believe the government is siding with Christians.

The articles Siahaan introduced also show how the government attempted to stop violence against Christians and others. By way of examples, an article in the Christian Post reported that in early 2004, unidentified assailants attacked two Protestant Churches

---

[6] The Report also noted that the "government tried and convicted at least 79 terror suspects and accomplices involved in religiously motivated attacks" during the period covered by the Report. One of those arrests was of Abdul Jabar, who was convicted of involvement in two church bombings on Christmas Eve in 2003.

in Palu, Central Sulawesi – an island far from Jakarta. The government later dismissed the police chief for negligence in not following a directive to boost police protection at places of worship ahead of the Christmas and New Year period. Another provincial police chief ordered that all churches be guarded by two uniformed and two plainclothes policemen. The President of Indonesia ordered security tightened in major cities such as Jakarta.

Moreover, Muslim Indonesians are not a unified, fundamentalist force. The Religious Freedom Report stated that "[i]n general, Islam in [Indonesia] remained overwhelmingly tolerant, with a pluralistic outlook." It noted that "[t]en percent or fewer of the country's Muslims advocate creating an Islamic state. . . ."

Another article Siahaan introduced stated that efforts to extend sharia [Islamic law] to the entire country [were] opposed even by the leaders of the leading Islamic organizations.

In sum, substantial evidence supports the BIA's finding that there is no pattern or practice of persecution of Christians in Indonesia.

## V.

For all of the above reasons, we will deny Siahaan's petition for review.

———————